Minute Order Form (06/97)

55-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 4760 | DATE | 5/24/2001 |
| CASE TITLE | Earnest Jackson vs. Larry G. Massanari | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter memorandum opinion and order. This case is remanded to the ALJ for further proceedings pursuant to the fourth sentence of 42 U.S.C. 405(g) and 1383(c)(3).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAY 2 3 2001 date docketed | |
| | Notified counsel by telephone. | | | 15 |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | FILED FOR DOCKETING | 5/24/2001 date mailed notice | |
| | Copy to judge/magistrate judge. | 01 MAY 24 PM 4: 08 | | |
| | IS  courtroom deputy's initials | Date/time received in central Clerk's Office | IS mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EARNEST JACKSON, ) | |
| ) | |
| Plaintiff, ) | Case No. 00 C 4760 |
| ) | |
| v. ) | Magistrate Judge |
| ) | Martin C. Ashman |
| LARRY G. MASSANARI, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff, Earnest Jackson, seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying Jackson Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Jackson challenges the Commissioner's decision on three grounds: the Administrative Law Judge's (the "ALJ") application of Rule 203.11 of the Medical-Vocational Guidelines (the "Grids"), the ALJ's failure to apply section 203.00(c) of the Grids, and the ALJ's failure to contact Dr. Lakshmi Duraj before assessing Jackson's residual functional capacity, as required by SSR 96-5p. For the following reasons, we remand this case to the ALJ for further proceedings.[2]

---

[1] On March 29, 2001, Larry G. Massanari became Acting Commissioner of Social Security. In accordance with Federal Rule of Civil Procedure 25(d)(1) and 42 U.S.C. §§ 405(g) and 1383(c)(3), Larry G. Massanari is automatically substituted for William A. Halter as the Defendant in this civil action.

[2] All parties have consented to have this Court conduct any
(continued...)

I.   Procedural Background

Jackson applied for DIB and SSI on December 21, 1998, alleging that he became disabled on September 27, 1996. The Social Security Administration denied Jackson's applications initially and on reconsideration. Jackson requested a hearing, which was held on January 14, 2000, before an ALJ. The ALJ elicited testimony from Jackson, who was represented by counsel; Dr. Lawrence Perlman, a medical expert; and Linda Gels, a vocational expert. In light of this and other evidence, the ALJ concluded that Jackson was not disabled based on Grid Rule 203.11.

Jackson requested review of the ALJ's decision by the Appeals Council. But on July 13, 2000, the Appeals Council denied review, thereby establishing the ALJ's decision as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Jackson now seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

II.   Factual Background

A.   Jackson's Testimony

Jackson was born on June 16, 1941, making him fifty-eight years old at the time of the hearing. He testified that he had a second-grade education, although apparently he attended school

---

[2](...continued)
and all proceedings, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(b).

through the fourth or sixth grade. Jackson could neither read nor count well.

In the past fifteen years, Jackson worked as a loader, assembler and driller, and bagger. The positions required heavy lifting, bending, and standing for extended periods of time. For example, the bagger position entailed lifting fifty-pound bags and placing them on a pallet every three minutes. Jackson's last employer terminated him on September 27, 1996, allegedly because Jackson was too slow. Between October 1996 and January 2000, Jackson gained approximately forty pounds.

Jackson attributed his inability to find work to his health. He became tired quickly and had trouble breathing, which limited him to lifting ten pounds and walking a couple of blocks. Furthermore, if he walked a couple of blocks, his back and legs ached; if he stood for thirty minutes, his legs and toes became numb.

On the average day, Jackson washed dishes, watched television, and sat on the porch. He drove a car once in a while, typically to the grocery store.

B.  **Medical Evidence**

The medical evidence contained a collection of progress notes and reports emanating from seven emergency room visits in December 1996. During this time, Jackson received treatment for urinary retention, hypertension, eye drainage, noninsulin-dependent diabetes, headaches, dizziness, and

hypercholesterolemia. On more than one occasion, Jackson was noncompliant with medication and his diabetes and hypertension were uncontrolled. A chest x-ray showed normal heart size and clear lungs; an abnormal EKG was considered insignificant; blood pressure fluctuated from 227/142 to 163/94. At the end of the month, Jackson was without symptoms.

A visit on January 7, 1997, revealed no symptoms, while in August 1997 Jackson complained of difficulty walking. Generally speaking a pattern developed: the severity of Jackson's medical condition depended on Jackson's effort to take his medication and monitor his diet.[3] It suffices to say that Jackson's control of his diabetes and hypertension was suboptimal. Even so, in June 1998 no end organ damage was discovered. Blood and urine tests taken in April 1999 were unremarkable.

On January 25, 1999, Dr. Dominic Gaziano examined Jackson at the request of the Bureau of Disability Determination Services (the "BDDS"). Jackson stated that he had diabetes, hypertension, hypercholesterolemia, dyspnea, back pain, headaches, and a cough sometimes. Furthermore, Jackson mentioned that he was hospitalized for two weeks for right pneumothorax, during which time he had a right chest tube placed. Jackson claimed compliance with his medications and denied any complications from diabetes and hypertension. Jackson also denied any weakness or

---

[3] Significantly, Jackson refused to take insulin at least three times from November 1997 to June 1998, despite being informed about the risks of this behavior.

numbness of his lower extremities. Finally, Jackson stated that he could walk four blocks without a cane.

Dr. Gaziano's examination revealed that Jackson could walk fifty feet without assistance, although his gait was slow. Toe walking and heel walking were normal; hand grip and dexterity were normal; but Jackson could only squat halfway to the floor. Dr. Gaziano found that Jackson had limited range of motion in the lumbosacral spine and noticed that flexion and extension of that area were associated with pain. An x-ray of Jackson's lumbosacral spine was negative.

About three weeks later, Dr. William Conroy reviewed Jackson's file and completed a Physical Residual Functional Capacity Assessment. Dr. Conroy concluded that Jackson could lift or carry fifty pounds occasionally and twenty-five pounds frequently. Jackson could stand or walk about six hours in an eight-hour workday, and sit for about the same period of time. Pushing or pulling was limited in the lower extremities. No postural limitations were noted.

On May 28, 1999, Jackson's treating physician, Dr. Duraj, completed a series of reports for the BDDS. On the diabetic report, Dr. Duraj recorded Jackson's onset date of diabetes as twelve years ago. Jackson's compliance with therapy was listed as good, no complications were noted. The report indicated, however, that Jackson's ability to lift and carry heavy objects was limited.

The cardiac report diagnosed hypertension, but placed no restrictions on Jackson's functional ability. Lastly, the spinal disorders report diagnosed chronic low back pain and lumbosacral strain, with an onset date of five years ago. Jackson's range of motion in his lumbosacral spine was restricted, and Jackson had a limited ability to lift, carry, or handle objects.

Approximately one week later, Dr. Conroy reviewed Jackson's file and completed another Physical Residual Functional Capacity Assessment. This time Dr. Duraj's reports were included in the medical file. Nonetheless, the limitations that Dr. Conroy placed on Jackson's abilities were identical to the February assessment.

Finally, in December 1999, Dr. Duraj completed a Physical Capacities Evaluation at the request of Jackson's counsel.[4] In the report, Dr. Duraj indicated that Jackson could sit for three hours and stand or walk for four hours in an eight-hour workday. Jackson could continuously lift or carry five pounds and occasionally lift or carry ten pounds. Reaching could be performed frequently; bending, squatting, and crawling occasionally; and climbing not at all. Certain repetitive movements could not be made with the hands or feet.

---

[4] Jackson's counsel made the request to clarify Dr. Duraj's earlier opinion that Jackson's ability to lift and carry was limited. See supra pp. 5-6.

C.  Medical Expert

At the hearing, Dr. Perlman testified at the request of the ALJ. Dr. Perlman diagnosed diabetes, hypertension, back pain, and a urinary problem. Pointing out the absence of end organ damage, Dr. Perlman determined that Jackson's impairments were not severe. Dr. Perlman also opined that none of Jackson's medications or medical conditions could cause fatigue. Any fatigue that Jackson experienced, Dr. Perlman suggested, was likely attributed to Jackson's increase in weight.

D.  Vocational Expert

Gels testified last at the hearing. She classified Jackson's relevant past work as unskilled and heavy; noting that most warehouse jobs do not fall below the medium exertional level. Based on Dr. Duraj's December evaluation, Gels believed that Jackson was not capable of performing his past work.

E.  ALJ's Decision

Considering the foregoing, the ALJ concluded that, despite having severe impairments and not being able to perform past relevant work, Jackson had the residual functional capacity to perform the full range of medium work. In light of Jackson's residual functional capacity, advanced age, marginal education, and previous work experience, the ALJ held that Grid Rule 203.11 directed a finding of not disabled. (*See* Record at 19-20.)

To arrive at this decision, the ALJ disagreed with Dr. Perlman's assessment of Jackson's impairments as not severe. The ALJ stated that Jackson's impairments at least minimally affect his ability to do work-related functions based on the medical record. Secondly, the ALJ disagreed with Dr. Duraj's December evaluation, which the ALJ viewed as inconsistent with Dr. Duraj's May reports. The May reports supported finding Jackson capable of medium work, while the December evaluation supported finding Jackson capable of only sedentary work. Because nothing in the record evinced Jackson's dramatic decline during these seven months, the ALJ did not give controlling weight to Dr. Duraj's December evaluation. To the extent that Gels based her testimony on Dr. Duraj's December evaluation, the ALJ gave that testimony no consideration.

Thirdly, the ALJ found Jackson's testimony not fully credible, in part because of Jackson's noncompliance with his medication but mostly because of medical evidence that did not reveal complaints associated with Jackson's claimed degree of limitation. This led to the ALJ discounting Jackson's complaints of fatigue.

### III. Discussion

The scope of judicial review in federal benefits cases is limited. With regard to the ALJ's factual findings, the reviewing court cannot reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ.

See *Jones v. Shalala*, 10 F.3d 522, 523 (7th Cir. 1993). Instead, the court only tests whether the ALJ's decision is supported by substantial evidence in the record. If it is, the decision must be affirmed. *See Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). In other words, the ALJ's findings must be supported by more than a mere scintilla of the evidence, but they may be supported by less than the greater weight of the evidence. *See id.; Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Of course the ALJ's application of legal principles is also subject to review. *See Griffith v. Callahan*, 138 F.3d 1150, 1152 (7th Cir. 1998); *Smith v. Bowen*, 792 F.2d 1547, 1549 (11th Cir. 1986). In this regard, review is plenary, not limited by the contours of substantial evidence. *See Lewis v. Apfel*, No. Civ.A. 99-0330-CB-G, 2000 WL 207018, at *3 (S.D. Ala. Feb. 16, 2000). The court must be satisfied that the ALJ's application of law is properly grounded.

## A. Grid Rule 203.11

Jackson first argues that the ALJ erred by relying on Grid Rule 203.11. Rule 203.11 is inapplicable, Jackson contends, because he does not have a limited education.

Application of the Grids comes into play at step five of the ALJ's sequential analysis.[5] *See Butera v. Apfel*, 173 F.3d 1049, 1054 (7th Cir. 1999); Medical-Vocational Guidelines, 20 C.F.R. ch. III, pt. 404, subpt. P, app. 2, § 200.00. At this step, the ALJ bears the burden of proving that a significant number of jobs exist in the national economy for the claimant to perform. *See*

---

[5] To determine whether a claimant is disabled, the ALJ conducts the following five-step analysis:

| | |
|---|---|
| Step one: | Is the claimant presently employed? If so, the claim is disallowed; if not, the inquiry proceeds to step two. |
| Step two: | Is the claimant's impairment severe and expected to last at least twelve months? If not, the claim is disallowed; if so, the inquiry proceeds to step three. |
| Step three: | Does the impairment meet or exceed one of a list of specific impairments? If so, the claimant is automatically disabled; if not, the inquiry proceeds to step four. |
| Step four: | Is the claimant able to perform her past relevant work? If so, the claim is denied; if not, the inquiry proceeds to step five where the burden shifts to the ALJ. |
| Step five: | Is the claimant able to perform any other work within his residual functional capacity in the national economy? If so, the claim is denied; if not, the claimant is disabled. |

*See* 20 C.F.R. §§ 404.1520, 416.920. The ALJ decided this case at step five. (*See* Record at 19-20.)

*Tackett v. Apfel*, 180 F.3d 1094, 1100-01 (9th Cir. 1999). If the burden is met, the claimant is not disabled; if the burden is not met, the claimant is disabled.

One method of meeting this burden is the Grids. *See Heckler v. Campbell*, 461 U.S. 458, 470 (1983); *Nelson v. Sec'y of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985). Consisting of matrixes based on a claimant's residual functional capacity, age, education, and previous work experience, the Grids determine whether a claimant has the ability to perform a significant number of jobs in the national economy. In this way, the Grids provide the ALJ with a short-hand method for determining a claimant's ability to find gainful employment, thereby eliminating the need for vocational testimony in less complex cases, and adding uniformity to the treatment of claims. *See Heckler*, 461 U.S. at 460-62.

Application of Grid Rule 203.11 hinges on a claimant of advanced age having the residual functional capacity for medium work, a limited education or less, and unskilled previous work experience. *See* Medical-Vocational Guidelines, 20 C.F.R. ch. III, pt. 404, subpt. P, app. 2., R. 203.11. Because "limited education or less" includes "marginal education," Jackson's argument as to the applicability of Rule 203.11 to this case is unfounded.[6] The ALJ properly applied Rule 203.11 in terms of

---

[6] Formal schooling at a sixth-grade level or less
(continued...)

Jackson's level of education; the rule accurately and completely reflects this limitation.[7]

## B. Section 203.00(c)

Jackson next argues that, notwithstanding Grid Rule 203.11, section 203.00(c) directs a finding of disabled. Section 203.00(c) precedes Rule 203.11 by carving out a specific medical-vocational profile from Table No. 3, in which Rule 203.11 appears. *See* SSR 82-63; *cf.* Medical-Vocational Guidelines, 20 C.F.R. ch. III, pt. 404, subpt. P, app. 2., § 203.00(c), *with id.* at R. 203.11. Simply put, section 203.00(c) bars an ALJ from applying Rule 203.11 and directs a finding of disabled. For section 203.00(c) to apply, a claimant of advanced age must have a residual functional capacity for medium work, a limited education or less, and no relevant work experience. *See id.* § 203.00(c).

As framed by the parties, the only issue is whether Jackson has "any relevant work experience." *See id.* § 203.00(c). Jackson argues that he has no relevant work experience because the ALJ determined that Jackson cannot perform his past relevant

---

[6](...continued)
constitutes a marginal education. Formal schooling at a seventh-grade through eleventh-grade level constitutes a limited education. *See* 20 C.F.R. §§ 404.1564(b), 416.964(b).

[7] Substantial evidence showed that Jackson had at most a sixth-grade education. (*See* Record at 68, 245, 253.)

- 12 -

work. (*See* Pl.'s Reply Mem. at 2; Record at 20.) The Commissioner contends that Jackson has relevant work experience because he previously worked. (*See* Def.'s Mem. Supp. Commissioner's Mot. Summ. J. at 13.) Neither party defined "relevant work experience," nor did they provide any authority on the issue -- an interesting way to proceed.

Work experience means "skills and abilities [the claimant] ha[s] acquired through work [the claimant] ha[s] done which show[s] the type of work [the claimant] may be expected to do." 20 C.F.R. §§ 404.1565(a), 416.965(a). Work experience is relevant if "it was performed within the pertinent 15-year period, lasted long enough for the individual to learn the job, and consisted of [substantial gainful activity]." *See* SSR 86-8. It need only enhance present work capability. *See* SSR 82-63.

One way to enhance present work capability is through learning skills. Other ways include developing abilities (1) to understand, remember, and execute instructions; (2) to respond appropriately to supervisors, coworkers, and customers; or (3) to deal with unusual work situations and changes in work setting. Thus, a history of unskilled work does not necessarily equate to an irrelevant work experience because even unskilled work develops desirable abilities.

That concept is illustrated here. Even though Jackson acquired no skills through his previous work, he acquired abilities through his work that enhance his present work

capability. Jackson worked as a loader for six years, an assembler and driller for six years, and a bagger for eleven years. (See Record at 63.) He is not in the same position as a person who has never worked before. Accordingly, section 203.00(c) does not apply.

### C. SSR 96-5p

Jackson's final argument is that the ALJ erred by not contacting Dr. Duraj before assessing Jackson's residual functional capacity, as required by SSR 96-5p. See Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 61 Fed. Reg. 34,471 (July 2, 1986). The duty to contact a treating physician arises where the treating physician offers an opinion on an issue reserved to the ALJ and the bases for such an opinion are not clear to the ALJ. See id. This obligation ensures that the ALJ will properly evaluate all the evidence in the record that may have a bearing on the determination or decision of disability, even if the evidence is not entitled to controlling weight or special significance.

In his findings, the ALJ rejected Dr. Duraj's December evaluation of Jackson's functional capacity. The December evaluation, like the May reports, limited Jackson's ability to lift and carry objects. (See Record at 212, 218, 228.) But unlike the May reports, the December evaluation placed express limits on Jackson's functional capacity that were tantamount to

finding Jackson capable of only sedentary work.[8] The ALJ stated that the two documents "appear[ed] to be inconsistent," and that the December evaluation was not consistent with the other evidence of record. (See Record at 18.)

The ALJ did not articulate a reason for finding the May reports and December evaluation inconsistent; and our own review of the documents reveals no basis for the finding. The May reports stated in general terms that Jackson's ability to lift and carry was limited. While the December evaluation goes into more detail, specifically listing the degree of limitation that Jackson's impairments cause to select physical activity. One supplements not contradicts the other.

Furthermore, the ALJ did not explain the inconsistency between Dr. Duraj's bases for limiting Jackson's functional capacity and the other medical evidence. Indeed, the ALJ couldn't. The December evaluation did not include any basis for the opinions expressed therein with regard to functional capacity. (See id. at 228.)

This confirms that the ALJ should have contacted Dr. Duraj before assessing Jackson's residual functional capacity. With no understanding of the bases underlying Dr. Duraj's December evaluation, the ALJ could not properly evaluate all of the

---

[8] Among other things, the December evaluation limited Jackson to continuously lifting or carrying five pounds and occasionally lifting or carrying ten pounds. (See Record at 228.)

pertinent medical evidence on the issue. *See Anaya v. Apfel*, No. 99 C 3830, 2000 WL 222640, at *8 (N.D. Ill. Feb. 24, 2000); *Lemelin v. Apfel*, No. 98-282-P-H, 1999 WL 33117108, at *4-5 (D. Me. May 17, 1999). On remand, the ALJ must reassess Jackson's residual functional capacity after contacting Dr. Duraj for clarification.

### IV. Conclusion

For the reasons stated, we remand this case to the ALJ for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and 1383(c)(3). The ALJ must contact Dr. Duraj to clarify the bases underlying Dr. Duraj's December evaluation and must reassess Jackson's residual functional capacity considering such information.

**ENTER ORDER:**

_____
MARTIN C. ASHMAN
United States Magistrate Judge

**Dated:** May 24, 2001.

Copies have been mailed to:

| | |
|---|---|
| AGUSTIN G. GARCIA, Esq.<br>Agustin G. Garcia, P.C.<br>53 West Jackson Boulevard<br>Suite 730<br>Chicago, IL  60604<br><br>Attorney for Plaintiff | YOUNG B. KIM<br>Assistant U.S. Attorney<br>U. S. Attorney's Office<br>219 South Dearborn Street<br>5th Floor<br>Chicago, IL  60604<br><br>Attorney for Defendant |